*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D. J. MITCHELL, JR., Minor.

UNPUBLISHED
February 26, 2025
11:28 AM

No. 370446
Wayne Circuit Court
Family Division
LC No. 2020-001060-NA

Before: MARIANI, P.J., and RIORDAN and FEENEY, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order terminating her parental rights to her minor child, DJM, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent).[1] Respondent-mother only challenges the trial court's best-interest findings. We affirm.

In November 2020, petitioner, Department of Health and Human Services (DHHS), filed a petition to remove DJM from respondent-mother's care. Respondent-mother was 16 years old at the time the petition was filed and was also in the foster care system. The petition alleged that respondent-mother was found sleeping on the side of a street in Farmington Hills, with DJM underneath her. The child, then 20 months, wore a soiled diaper, and respondent-mother had no other diapers or food for DJM. The trial court held a preliminary hearing and removed DJM from respondent-mother, but placed him with Tarra Booth, respondent-mother's foster care placement, to allow respondent-mother and DJM to reside together. The trial court took jurisdiction over DJM pursuant to a plea by respondent-mother.

In January 2021, respondent-mother agreed to a parent-agency agreement, which required her to comply with and benefit from infant mental health (IMH) therapy and individual therapy,

---

[1] Respondent-father's parental rights were also terminated; however, he is not a party to this appeal.

complete a psychological evaluation, obtain income, continue school, and remain in a DHHS-approved placement. Over the course of three years and 12 dispositional review hearings, respondent-mother was inconsistent in completing her case services. She was not resistant to services, and readily engaged in them for periods of time; however, they were continually stalled due to respondent-mother going absent without leave (AWOL) from her placements. She was close to obtaining reunification in fall 2022, but her compliance with services began to sharply decline after respondent-mother gave birth to her second child, JSC, and got into a relationship that led to incidents of domestic violence.

In July 2023, DHHS filed a petition to terminate respondent-mother's parental rights, alleging primarily that respondent-mother failed to complete and benefit from her case service plan. It requested that the court find DJM was without proper care and custody, and terminate respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent).

The trial court held the termination proceedings over four separate hearings, from October 2023 to January 2024. Around this time, respondent-mother moved to Ohio to reside with her cousin, Shadea White. During the course of the proceedings, DHHS filed a petition to remove her other daughter, JSC. During the pendency of DJM's case, respondent-mother also gave birth to a third child, KG, who was removed by Ohio Child Protective Services (CPS) and subject to out-of-state child protective proceedings. After the first three hearings, the trial court found statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Finally, after a best-interest hearing, the trial court determined it was in DJM's best interests to terminate respondent-mother's parental rights due to her noncompliance with case services and DJM's need for stability and permanence. Accordingly, respondent-mother's parental rights were terminated.

Respondent-mother argues that the trial court clearly erred in determining that termination of her parental rights was in DJM's best interests. We disagree.

"Once a statutory basis for termination of parental rights has been demonstrated, the trial court must terminate parental rights if a preponderance of the evidence establishes that termination is in the best interests of the child." *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 5. This Court also reviews for clear error a trial court's finding that it was in the child's best interests to terminate a respondent's parental rights. *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022). A trial court's decision to terminate parental rights is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 9 (quotation marks and citation omitted).

"Once a statutory basis for termination of parental rights has been demonstrated, the trial court must terminate parental rights if a preponderance of the evidence establishes that termination is in the best interests of the child." *Lombard*, ___ Mich App at ___; slip op at 5. The focus at the best-interest stage is on the child, and not the parent. *Atchley*, 341 Mich App at 346. This Court has articulated the following considerations with respect to a trial court's best-interest analysis:

The trial court may consider various factors when making its best-interests determination, including the child's bond to the parent, the parent's parenting ability, and the child's need for permanency, stability, and finality. Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history. The court may also consider whether the parent can provide a permanent, safe, and stable home. Additionally, the court may consider the parent's compliance with his or her case service plan, the parent's visitation history with the child, the [child's] well-being while in care, and the possibility of adoption. [*MJC*, ___ Mich App at ___; slip op at 9-10 (quotation marks and citations omitted).]

Here, the testimony supports the trial court's determination that termination was in DJM's best interests. Despite respondent-mother's testimony that she and DJM were bonded, the record otherwise showed that by the best-interest hearing, their bond was diminished due to respondent-mother's lack of visitation. The best-interest clinic report also noted that there was no observable bond between respondent-mother and DJM. During observation, neither respondent-mother nor DJM seemed to miss one another, and when DJM was asked whether he missed respondent-mother, he said no. The court explicitly noted the "questionable" bond between respondent-mother and DJM in making its determination, which was adequately supported by the record.

Respondent-mother's parenting ability was also called into question throughout the case. Respondent-mother readily acknowledged that due to her age and immaturity, she did not make adequate parenting decisions or focus on her services early in the case. Even as the case progressed, respondent-mother remained inconsistent with her services and displayed questionable decision making due to noncompliance with her parent-agency agreement. Despite the more intensive services offered to respondent-mother when the case was placed on the Baby Court docket, Heather Huber, a DHHS foster care specialist, testified at length that respondent-mother continually went AWOL from her placements. The longest respondent-mother stayed in a placement was five months. Further, as the services progressed, she became involved in a relationship that exposed herself and her other child, JSC, to domestic violence.

Her inconsistency impacted her visitation with DJM because she was "in and out of his life." After respondent-mother moved to Ohio in 2023, she visited him only twice. During the termination proceedings, respondent-mother did not visit DJM once between the close of the statutory-grounds hearings and the best-interest hearing. And although she saved $3,000 for when her children came home, she did not use that money to attend visitation. Respondent-mother's inconsistency in DJM's life appeared to have an impact on him. He misbehaved in daycare after parenting-time visits, and was expelled from daycare due to increased aggression. By the best-interest hearing in January 2024, there was a diminished bond between respondent-mother and DJM due to her lack of visitation; however, DJM's behavior improved when he was not regularly visiting with respondent-mother.

Respondent-mother had significant mental health diagnoses throughout the case, including bipolar II disorder, autism-spectrum disorder, borderline-personality disorder, and post-traumatic stress disorder (PTSD). Despite these diagnoses, respondent-mother did not remain committed to attending individual therapy and continually stopped services or left her placements. Respondent-mother acknowledged that her participation in therapy was inconsistent because she felt she did

not have a good match with her therapists. But Huber testified that respondent-mother was referred to four or five therapists, and continually requested new ones. Respondent-mother did not appear to benefit from her limited involvement with mental-health services throughout the case because she did not engage in services long enough to begin working toward her treatment goals.

Respondent-mother also did not consistently attend school or maintain employment due to departing from her placements. Her two pregnancies also prevented her from obtaining consistent employment. With regard to her housing, although respondent-mother appeared to have stable housing with White in Ohio, it was not cleared by CPS due to White's criminal history. Further, respondent-mother did not pay rent, and to some extent, relied on White to maintain the residence. White and respondent-mother also planned to relocate to Michigan, but the only detail respondent-mother knew about the new residence was that it was in Detroit.

Though respondent-mother was engaged in services by the best-interest hearing, such as attending school, working two jobs, and seeing a therapist, Huber testified that the issue was never respondent-mother's engagement or willingness to participate in services, but her lack of follow-through in completing them.

Aside from respondent-mother's noncompliance with services, DJM needed permanency, stability, and finality that respondent-mother could not provide due to her inconsistency. DJM was in foster care for three years, and lived with Booth since November 2020. Booth was a regular and consistent part of his life, and the two had a solid relationship. DJM was doing well in his placement, and bonded with his foster parents, who planned to provide for him long-term through adoption. Clearly, Booth remained a stable placement for DJM over the course of three years and was able to provide him with permanency.

Many of respondent-mother's assertions on appeal are contradicted by the record. Respondent-mother claims that DJM was raised by her for three years of his life, but this is contradicted by testimony that he was born in 2019 and resided with Booth since November 2020, and respondent-mother left their shared placement in May 2021. Respondent-mother also claims she was not offered virtual visitation while living in Ohio; however, Huber testified that respondent-mother had one virtual visit and that when Huber otherwise attempted to schedule virtual visitation, respondent-mother did not respond. Further, Claudia Redfearn, another foster-care specialist with DHHS, also indicated that virtual visits could be available if respondent-mother provided advance notice. Finally, although respondent-mother claims to have been in contact with the case workers more often than not, by the best-interest hearing, she had not returned their calls or followed up with them to confirm her engagement in Ohio services.

Finally, respondent-mother argues that it is in DJM's best interests to remain placed with his sibling, and that respondent-mother should be able to continue her reunification efforts with DJM as she works on her case with JSC. With regard to DJM's interest in remaining placed with his sibling, there was no immediate threat of separation because DJM and JSC were still placed in the same home. Further, with respect to the argument that the trial court erred in terminating respondent-mother's parental rights to DJM while she continued to work on services for JSC, "the trial court has a duty to decide the best interests of each child individually." *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The trial court also acknowledged this in

its reasoning, and found JSC's ongoing case did not impact its ultimate conclusion that termination was in DM's best interests.

The foregoing facts demonstrate, by a preponderance of the evidence, that termination was in DJM's best interests. Accordingly, the trial court did not clearly err in determining that it was in DJM's best interests to terminate respondent-mother's parental rights.

Affirmed.

/s/ Philip P. Mariani
/s/ Michael J. Riordan
/s/ Kathleen A. Feeney